UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


A.L.

               Plaintiff,                Civil Case No.
                                         10-CV-10354

vs.

                                         HON. MARK A. GOLDSMITH

ANN ARBOR PUBLIC SCHOOLS,
et al.,

               Defendant.

_____/


## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS


Plaintiff A.L., a special education student, filed suit pursuant to (i) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq*., (ii) Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, (iii) the Michigan Persons with Disability Civil Rights Act (PWDCRA), Mich. Comp. Laws §§ 37.1101 *et seq.*, and (iv) 42 U.S.C. § 1983, related to her alleged sexual assault by a fellow student at an Ann Arbor public school.  Before the court is Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons explained below, the motion is granted in part and denied in part.

### I.      Factual and Procedural Background

A.L. was born on December 28, 1990, and was 18 years old when the events in this action took place.  A.L. has a history of psychological issues, including being diagnosed with mood disorder, non-verbal learning disorder, anxiety, attention deficit hyperactivity disorder (ADHD), and intermittent explosive disorder.  Docket Entry (D.E.) 1 at ¶¶ 8-9 (complaint).  A.L. was certified for

special education, with a primary disability of emotional impairment and a secondary disability of a specific learning disability in math calculation. D.E. 1 at ¶ 10.

From February 2007 to January 2008, A.L. was placed at Island View Residential Treatment Center. D.E. 13-3 at 1 (due process complaint).[1] Before A.L. returned from Island View, A.L.'s mother met with representatives of Ann Arbor Public Schools to register A.L. for school. *Id.* Although A.L. did register for school, she did not immediately attend an Ann Arbor public school. Instead, A.L. attended a private school, Ann Arbor Academy, because in contrast to the public school, Ann Arbor Academy offered the small, structured classroom setting that Island View had recommended for A.L. *Id.* at 2. In May 2008 school district officials and A.L.'s parents met in a Individualized Education Program (IEP) team meeting, designed to establish the school district's plan for addressing A.L.'s educational needs. *Id.* A.L.'s parents, dissatisfied with the school district's plan, signed the IEP in disagreement. They maintained that the public schools did not have an appropriate public school placement for A.L.; they also informed the IEP team that they were requesting "private placement [at Ann Arbor Academy] at public expense." *Id.* A.L. continued to attend Ann Arbor Academy.

On March 9, 2009, A.L.'s parents submitted a due process complaint and request for a hearing with the State Office of Administrative Hearings and Rules pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, on A.L.'s behalf. *Id.* at 1. The complaint alleged that the school district failed to provide A.L. with a free appropriate public

---

[1]The document at docket entry 13-3 is a March 9, 2009 letter from A.L.'s attorney to Larry Simpson of Student Intervention and Support Services, apparently affiliated with Ann Arbor Public Schools. The parties refer to this letter as a due process complaint. This opinion will use the same terminology.

1

education (FAPE) because, *inter alia*, the school district failed to present A.L. with "any viable educational options within Ann Arbor Public Schools" in the May 2008 IEP meeting.[2]  *Id*. at 2.

A.L.'s parents and the school district entered into a mediation process through the Washtenaw County Dispute Resolution Center.  In April 2009, the parties signed an agreement.  The agreement provided that the due process complaint would be held in abeyance for a period of time, during which A.L. would attend a public school, Huron High School, on a limited basis.  D.E. 17-4 (mediation agreement).  The agreement provided that A.L. "will take one elective with a parapro for an escort and for support at an Ann Arbor Public High School following the IEP (Individualized Education Program) this Spring 2009."[3]  *Id*.  According to the complaint, A.L.'s parents insisted on the escort requirement in negotiations with the school district because, due to A.L.'s "attractiveness, personality, and lack of appropriate emotional regulation," she is particularly vulnerable to "being taken advantage of."  D.E. 1 at ¶ 13.  A.L.'s mother stated that protecting A.L. from unwanted male attention was an important consideration when enrolling her at Huron High School.  D.E. 17-3 at ¶ 7 (A.L.'s mother's affidavit).

In May 2009 A.L. began attending Huron High School to take an art class.  Beginning on A.L.'s first day of school, the school district provided her with an adult escort.  The escort met A.L. at her taxi and accompanied her to her art class; after class he accompanied her back to the taxi. D.E. 1 at ¶¶ 21-22.

---

[2]The complaint raised several other related claims, including that the school district had not developed a transition plan for A.L., had not offered any extended-school-year services to A.L., and had committed procedural violations in the IEP process.  *Id*. at 2-3.

[3]"Parapro" is short for paraprofessional.  The parties consistently refer to this paraprofessional as A.L.'s "escort" or "adult escort."

In class, a male student named "D.J." began flirting with A.L.  During the first week of class, he gave her poetry and kissed her in front of their classmates.  D.E. 1 at ¶ 23.  Also during that first week, A.L.'s escort, a man she believes is named Mr. Lee, asked her if she would feel comfortable not being escorted, and she responded that she would rather be escorted.  D.E. 17-2 at ¶ 13 (affidavit of A.L.).

On the Monday of the following week, May, 18, 2009, Mr. Lee again asked A.L. if she felt comfortable not having an escort and urged her to try going without him.  In response, A.L. asked him to escort her to class.  He did, but again asked if she "was OK if he did not meet [her] after class, or escort [her] anymore."  D.E. 17-2 at ¶ 15.  A.L. agreed.  A.L. was not escorted after that Monday's class and was never escorted again.  D.E. 17-2 at ¶¶ 16-17.  On the first day she was not escorted, D.J. said something to A.L. about whether she still had an escort; A.L. responded that she "wasn't going to have one anymore."  D.E. 17-2 at ¶ 18.

At some point during this time, Jennifer Hein, Huron High School 12th Grade Administrator, telephoned A.L.'s mother and told her that having an adult escort made A.L. "a pariah," and "pressured Mrs. L. to waive this requirement."  D.E. 1 at ¶ 24.  A.L.'s mother agreed.  D.E. 1 at ¶ 26.[4]

Nothing eventful occurred on Tuesday, May 19, 2009.  A.L. missed the next two days of school and returned on Friday, May 22, 2009.  D.E. 1 at ¶ 28.  According to the complaint, on Friday after class D.J. took A.L. to a secluded stairwell without security cameras and forced her to perform oral sex on him.  D.E. 1 at ¶ 29.  Immediately afterward, D.J. attempted to take A.L. into a nearby

---

[4]It is not clear from the record whether Lee's conversations with A.L. or Hein's conversations with A.L.'s mother occurred first.

restroom, but A.L. was able to persuade D.J. to stop.  D.E. 1 at ¶ 30.[5]  Afterward, D.J. walked A.L.

to her waiting taxi.  D.E. 1 at ¶ 31.

Later that day, A.L. and her mother went to the police department and made a report.  D.E.

17-2 at ¶ 23.[6]  As a result of the encounter, A.L. was terrified to return to Huron and "experienced

tremendous anxiety, fear, stress, emotional distress, and depression."  D.E. 1 at ¶ 32.

The school district reaffirmed the adult-escort requirement in a subsequent (August 2009)

IEP.  *See* D.E. 1 at ¶ 33 (A.L. "will have an adult escort to and from classes in buildings with her

peers.")  However, A.L. did not return to Huron High School, and instead attended Ann Arbor

Academy.  A.L. continued to attend Ann Arbor Academy until her graduation in June 2010.  D.E.

17-2 at ¶¶ 26-27.

On October 12, 2009 a prehearing conference was held before a state administrative law

judge (ALJ) regarding A.L.'s previously filed due process complaint.  D.E. 17-8 (10/12/09

Conference Tr.).  During the hearing, counsel for A.L. informed the ALJ of the alleged sexual

assault that had occurred after the complaint had been submitted.  Counsel also told the ALJ that

A.L.'s parents had retained separate legal counsel and were considering filing a civil rights lawsuit

with regard to the assault.  D.E. 17-8 at 2.  At the hearing, the parties and the ALJ discussed at

length whether the court would consider evidence of the alleged sexual assault, whether the

allegations were separate from the IDEA claims pending before the ALJ, the school district's

---

[5]A.L.'s account of the assault is included in a separate statement attached to her affidavit.
*See* D.E. 17-2 at 6.  According to that statement, after forcing her to perform oral sex, D.J. also
touched her genitals.

[6]According to A.L.'s affidavit, sometime the following week, she and her mother had a
meeting with Jennifer Hein in which Hein told A.L. "We never should have taken away your
escort."  D.E. 17-2 at ¶ 14.

position that any potential claims regarding the assault would need to be exhausted in the then-current ALJ proceedings, and A.L.'s position that any potential future claims regarding the assault that would seek damages would not need to be exhausted.  The ALJ stated that he would only consider evidence of the alleged assault for the limited purpose of determining whether the school district had denied A.L. a FAPE as defined by the IDEA.  *See* D.E. 17-8 at 11-12.  The ALJ repeatedly stated that he would not make any other determination as to the alleged sexual assault.  *See* D.E. 17-8 at 14, 16, 27.

On January 26, 2010, A.L. filed suit in this Court against Defendants Ann Arbor Public Schools and Jennifer Hein.  The complaint alleges discrimination and failure to accommodate under (i) the ADA, (ii) Section 504 of the Rehabilitation Act, and (iii) the PWDCRA.  The basis of these claims is that the school district discriminated against A.L. or failed to accommodate her by "discontinuing the adult escort in violation of A.L.'s documented needs as well as the agreement among all parties to continue providing such escort."  D.E. 1.  A.L. also brings a claim pursuant to 42 U.S.C. § 1983 alleging that both the school district and Hein are liable under a "government-created danger" theory for violation of A.L.'s right to liberty under the Fourteenth Amendment.  D.E. 1 at ¶ 78.

In April 2010, the parties reached a settlement in the state due process matter.  D.E. 14.  Under the settlement agreement, in exchange for a payment from the district, A.L. and her parents agreed to release the school district and its employees and agents "from any and all claims, demands, actions or causes of action, whether asserted or not, arising out of the facts and circumstances alleged in the Proceedings that have been brought or could have been brought in any administrative or judicial forum under the IDEA only."  D.E. 14 at 2.

On June 16, 2010, Defendants filed in this Court a motion to dismiss pursuant to Federal

Rule of Civil Procedure 12(b)(6).  D.E. 13.  The Plaintiff filed a response to the motion (D.E. 17)

and Defendants replied (D.E. 19).  On November 22, 2010, this Court held a hearing on the motion.

## II.   Discussion

In their motion, Defendants raise five arguments:  (i) A.L.'s claims must be dismissed for

failure to exhaust her due process remedies, (ii) A.L.'s claims are barred by the April 2010

settlement agreement between the parties, (iii) the PWDCRA claims are precluded by the Michigan

Mandatory Special Education Act (MMSEA), Mich. Comp. Laws § 380.1701, *et seq.*, (iv) Hein is

entitled to qualified immunity, and (v) A.L. has not alleged sufficient facts to support her § 1983

claim.

Although Defendants titled the motion as a motion to dismiss, Defendants present

information and evidence outside of the pleadings.  Because the Court will not exclude the extra-

pleading evidence presented, the motion will be construed as a motion for summary judgment.  *See*

Fed. R. Civ. P. 12(d).[7]  Summary judgment should be granted only if there is no genuine dispute as

to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

---

[7]A district court construing a motion to dismiss as a motion for summary judgment
"should give the parties notice and an opportunity to present all material relevant to a motion for
summary judgment."  *Northville Downs v. Granholm*, 622 F.3d 579, 585 (6th Cir. 2010).
However, "[t]he district court's failure to give such notice and opportunity to respond is not
reversible error . . . where all parties in fact had a sufficient opportunity to present pertinent
materials."  *Id*. at 504 (citation omitted).

Here, despite labeling its motion as one to dismiss pursuant to Rule 12(b)(6), Defendants
explicitly sought summary judgment on some claims and cited the standard for summary
judgment in addition to the standard for a motion to dismiss.  *See* D.E. 13.  The Plaintiff clearly
recognized that it was responding to a motion that at least in part sought summary judgment, as it
characterized Defendants' motion as one "to dismiss/for summary disposition," and attached its
own significant amount of extra-pleading material.  *See* D.E. 17.  Under the circumstances, the
parties had notice that the motion would be subject to a summary judgment determination.

56(a).  As the Sixth Circuit has explained,

> the burden is generally on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by "showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal quotation marks omitted).  In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Thus, the facts and any inferences that can be drawn from those facts[ ] must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

*Biegas v. Quickway Carriers*, *Inc*., 573 F.3d 365, 373 (6th Cir. 2009) (quotation marks omitted).

### A.      Failure to Exhaust

Under the IDEA, plaintiffs must exhaust their administrative remedies before bringing suit in federal court seeking relief that is also available under the IDEA.  *See Doe v. Smith*, 879 F.2d 1340, 1343-44 (6th Cir.1989), *cert. denied*, 493 U.S. 1025 (1990).  The statute provides in relevant part:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C. § 12101 et seq.], title V of the Rehabilitation Act of 1973 [29 U.S.C. § 791 et seq.], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(l).  Subsections (f) and (g) provide for a due process hearing and appeal before a state agency.  *See* 20 U.S.C. §§ 1415(f), (g).

Defendants argue that A.L.'s claims "arise under the purview of the IDEA" and thus, require exhaustion.  D.E. 13 at 8.  They contend that the complaint cites as the reason for the resulting

7

sexual assault the school district's failure to comply with the requirements of A.L.'s IEP (specifically the failure to provide an adult escort to and from class), and that such a claim is an IDEA claim.  In response, the Plaintiff argues that she was not required to exhaust her administrative remedies because exhaustion would have been futile.  She cites in support the Sixth Circuit's decision in *Covington v. Knox County School System*, 205 F.3d 912 (6th Cir. 2000), holding that it would have been futile for the plaintiff to exhaust the § 1983 claims where the plaintiff was seeking only money damages and had already graduated from the defendant school district.  She also argues it would have been futile to exhaust in light of the ALJ's statements about not considering claims related to the alleged assault.

In *Covington*, the plaintiff parent alleged § 1983 claims based on her son, a special education student, being locked in a vault-like "time-out room" for hours at a time as a disciplinary measure. Covington requested a due process hearing under the IDEA, but the hearing was repeatedly delayed, and, before it took place, Covington filed her § 1983 claims in federal court.  Defendants moved for summary judgment, which the district court granted, citing Covington's failure to exhaust administrative procedures.  The District Court concluded that the use of the "time-out room" as a disciplinary measure was mentioned in Covington's son's IEP and was "a matter subject to the IDEA."  *Id*. at 914.  Thus, "Covington was required to exhaust her administrative remedies as contemplated by the IDEA, because her complaint involved the school's disciplinary practices." *Id*.

The Sixth Circuit reversed.  The Court declined to decide the preliminary issue of whether Covington was required to exhaust under the IDEA (*i.e.*, whether Covington's § 1983 claims sought "relief that is also available under" the IDEA pursuant to 20 U.S.C. § 1415(l)).  *Id*. at 916.  Instead,

the Court concluded that, given the circumstances, exhaustion would be futile in Covington's case:

> . . . we hold that in the unique circumstances of this case – in which the injured child has already graduated from the special education school, his injuries are wholly in the past, and therefore money damages are the only remedy that can make him whole – proceeding through the state's administrative process would be futile and is not required before the plaintiff can file suit in federal court.

*Id*. at 917 (footnote omitted). *Cf. S.E. v. Grant Cty. Bd. of Educ.*, 544 F.3d 633 (6th Cir. 2008) (exhaustion required where plaintiff had not yet graduated and requested relief related to her educational program). Notably, the *Covington* court took great pains to explain the limitations of its decision. It specified that a "mere claim for money damages is not sufficient to render exhaustion of administrative remedies unnecessary." *Covington*, 205 F.3d at 917. Nor may parents avoid the exhaustion requirement through "the unilateral act of removing their child from a public school." *Id*. at 918 (citing *Doe*, 879 F.2d at 1343).

This Court concludes that *Covington* governs the exhaustion issue in this case. As in *Covington*, here A.L. seeks only money damages and has graduated.[8] Regardless of whether A.L.

---

[8]These two points require some additional explanation. With regard to A.L.'s graduation, A.L. had not yet graduated at the time the complaint was filed (January 2010), but has since graduated (in June 2010). Defendants apparently did not know this fact and originally argued in their motion that A.L. was still in school. After learning that A.L. had graduated in A.L.'s response to the motion, Defendants assert in their reply that A.L.'s futility argument is negated by the fact that the due process proceedings had commenced before her graduation. D.E. 19 at 4. The *Covington* case cuts against Defendants' argument. There, too, the student had begun the administrative process while still enrolled in the school and graduated over two years later. *See Covington*, 205 F.3d at 913-14. Nevertheless, the court considered the student a student who had graduated for purposes of exhaustion-futility analysis.

With regard to A.L. seeking only money damages, the complaint contains conflicting information. In paragraph six, the complaint asserts that A.L. "seeks only monetary damages to compensate her for the assault causing her injuries." However, in the "Relief Requested" section, the complaint requests in addition to money damages, "any other relief as is just and allowed by law, including but not limited to equitable, injunctive[,] and declaratory relief permitted under the ADA and PWDCRA." D.E. 1 at 12. This second request is not a bar to concluding that exhaustion would have been futile. Again, *Covington* presented a similar

9

was obligated to exhaust under 20 U.S.C. § 1415(l), under these circumstances exhaustion would have been futile because "money damages, which are unavailable through the administrative process, are the only remedy capable of redressing [A.L.'s] injuries." *Covington*, 205 F.3d at 913-14. *See also Molina v. Bd. of Educ.*, No. 07-10948, 2007 WL 4454928, at *4 (E.D. Mich. Dec. 14, 2007) (unpublished) (exhaustion would have been futile where student brought § 1983 claim seeking monetary damages and student had moved to another state).

It is noteworthy that some courts have declined to apply *Covington*'s approach, even when the plaintiff is both no longer in school and seeks money damages. For example, in *Amidon v. Michigan*, No. 04-75003, 2008 WL 723536 (E.D. Mich., Mar. 17, 2008) (unpublished) the court held that the plaintiff was obligated to exhaust his claim even though he requested money damages and had dropped out of school. The court distinguished *Covington* because, in *Covington*, the plaintiff alleged claims for which damages would have been the only adequate remedy even had he sought immediate relief at the time of the wrongdoing. In contrast, the plaintiff in *Amidon* sat on his rights, despite raising precisely the type of injury "that the IDEA-mandated administrative process is intended to address and ameliorate": an IDEA claim that the school failed to provide him with appropriate educational services. *Id*. at *12. Thus, the plaintiff had the opportunity to have the harm that he suffered "undo[ne]" by the administrative exhaustion process, but failed to take the

---

situation. There, the complaint, in addition to requesting money damages, requested injunctive relief enjoining defendants from treating other students in the same way. Nevertheless, the claim "did not enter into [the Court's] analysis" because Covington had not demonstrated any basis upon which she would be entitled to assert the rights of other students, and her son would not be entitled to the injunctive relief requested. *Covington*, 205 F.3d at 918 n.7. Similarly, as a student who has graduated, A.L. has not established how she would be entitled to any of the equitable, injunctive, and declaratory relief she may be requesting. Accordingly A.L.'s possible request for non-monetary damages does not affect the futility analysis.

opportunity. *Id.* at *11 (citing *Polera v. Bd. of Educ.*, 288 F.3d 478, 490 (2d Cir. 2002)).

Even assuming that *Covington*'s holding may be limited by the principles described in *Amidon*, the result here would be the same. Although A.L. had not yet graduated at the time the federal complaint was filed, the administrative process could not have undone the harm that she suffered. She does not seek relief related to her educational process, but seeks damages as the only adequate remedy.

Accordingly, because A.L. seeks money damages, is no longer in school, and alleges the kind of harm that could not be "undone" by the administrative process, exhaustion would be futile pursuant to *Covington*. Because *Covington*-based futility defeats Defendant's argument that A.L.'s claims should be dismissed for failure to exhaust, the Court need not resolve whether the ALJ's comments regarding the sexual assault allegations create an additional ground for exhaustion being futile.[9]

## B.     Impact of the April 2010 Release and Settlement Agreement

Pursuant to the settlement agreement between the parties in the state due process proceeding, A.L. and her parents agreed to release the school district and its employees and agents "from any and all claims, demands, actions or causes of action, whether asserted or not, arising out of the facts and circumstances alleged in the Proceedings that have been brought or could have been brought in any administrative or judicial forum under the IDEA only." D.E. 14 at 2.

Defendants argue that this language bars A.L.'s claims. They contend that, despite the fact

---

[9]In any case, it is not clear whether the ALJ was willing to consider at that time the specific claims now before this Court; it is also not clear whether the ALJ's view on what he would consider in the administrative proceeding should be dispositive on the question of futility in this case.

11

that A.L. does not label her claims as IDEA claims, the "gravamen" of A.L.'s complaint is that Defendants failed to comply with her IEP – a claim arising under the IDEA.  D.E. 13 at 12, 8.  A.L. responds that her claims in the instant suit are not disguised IDEA claims.  D.E. 17 at 15.  She also argues that an April 6, 2010 hearing before the ALJ, which occurred while the parties were negotiating the settlement agreement, makes clear that "the parties intended to cover only the due process matter" in the release agreement.  D.E. 17 at 16.

This Court cannot conclude that, as a matter of law, the release bars the claims raised in this case.  For the reasons that follow, both the language of the release and the circumstances surrounding its adoption provide ample evidence for a fact finder to conclude that the release does not bar the claims.

As to the language of the release, the first issue concerns the phrase "arising out of the facts and circumstances alleged in the Proceedings."  It is unclear whether the factual circumstances underlying A.L.'s federal claims – the removal of her escort and the alleged sexual assault – were ever actually "alleged in the Proceedings" of the administrative process.  The due process complaint, filed well before the assault occurred, does not allege any of the relevant facts.  D.E. 13-3.  Although the ALJ was later informed to some degree of the assault, this information was given to him informally by the parties' counsel in pre-hearing telephone conferences.  *See* D.E. 17-8 (10/12/09 Conference Tr.) & D.E. 17-10 (4/6/10 Conference Tr.).  The phrase "alleged in the Proceedings" may be interpreted as encompassing the non-written assertions made concerning the assault, or more restrictively as including only the written allegations of the due process complaint, which did not include any allegations relative to the assault.  Due to this ambiguity, a fact finder could conclude that A.L.'s federal claims do not arise out of "the facts and circumstances alleged in the [state due

process] Proceedings," thereby rendering the federal claims outside the scope of the release agreement. *See*, *e.g.*, *W.B. v. Matula*, 67 F.3d 484, 498 (3d Cir. 1995) (summary judgment for defendant inappropriate where waiver of IDEA-related claims contained ambiguities), *abrogated on other grounds by A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791 (3d Cir. 2007).

Secondly, the language "have been brought or could have been brought . . . under the IDEA only" on its face arguably contradicts Defendants' position. It appears to bar only IDEA claims, and/or claims that could only have been brought under the IDEA. Neither of these restrictions applies here to bar A.L.'s non-IDEA claims currently before the Court. To the extent that Defendants argue for a different understanding, they would have to persuade a fact finder that the release bars the claims beyond what the bare language appears to support.

Finally, in addition to the language of the agreement, the circumstances surrounding its adoption make it arguable that the parties did not intend for the release to preclude the instant claims. As revealed by the transcript from the state due process hearing held just days before the date of the agreement, the parties had previously attempted to come up with a "comprehensive" settlement that would have addressed both the due process claims and the claims filed in federal court. D.E. 17-10 at 12. That potential comprehensive settlement "fell apart." *Id.* Thus, there is evidence that the agreement that resulted is necessarily something less than the "comprehensive" settlement contemplated earlier, and that the resulting agreement was not meant to bar the federal suit already filed.

Because there is evidence that the release agreement does not bar A.L.'s federal claims, this issue presents a genuine dispute of material fact for a jury to decide, making summary judgment

inappropriate.[10]

### C.      § 1983 Claim

Defendants make two separate arguments regarding the § 1983 claim – that it should be dismissed for failure to allege sufficient facts to support a claim, and that Defendant Hein is entitled to qualified immunity.

#### 1.      Failure to State a Claim

Because Defendants' argument that A.L.'s § 1983 allegations fail to state a claim relies only upon the allegations in the complaint, the Court reviews this argument pursuant to Federal Rule of Civil Procedure 12(b)(6).  A Rule 12(b)(6) motion tests the sufficiency of the complaint.  *See Riverview Health Inst., LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

---

[10] Concerning the interpretation of a waiver agreement, some courts hold that an agreement in which an individual allegedly waives civil right claims is subject to a heightened standard before it may be enforced.  *See*, *e.g.*, *Matula*, 67 F.3d at 498 (Third Circuit decision applying "the more searching standards reserved for waivers of civil rights claims," rather than general contract principles in evaluating a waiver of IDEA-related claims).  The Sixth Circuit's case law does not appear uniform on this point.  *Compare Sako v. Ohio Dept. of Admin. Servs*, 278 F. App'x 514, 517-18 (6th Cir. 2008) (applying "ordinary contract principles" in interpreting a settlement agreement waiving plaintiff's Title VII claim) *with Thurman v. DaimlerChrysler, Inc.*, 397 F.3d 352, 358 (6th Cir. 2004) (observing that "[w]aivers in civil rights cases must be carefully scrutinized for voluntariness," and applying a "heightened level of scrutiny" in a case involving Title VII and 42 U.S.C. § 1981 claims).  Because the Court concludes that the agreement was ambiguous (at a minimum) under general contract principles, the agreement would certainly be ambiguous under the more heightened standard.

a.       **State-Created Danger**

A.L.'s § 1983 claim alleges that Defendants created a special danger for A.L., exposing her to the risk of third-party violence.  This is a Fourteenth Amendment claim stemming from the alleged deprivation of A.L.'s liberty without due process of law.

"The Due Process Clause of the Fourteenth Amendment does not impose upon the state an affirmative duty to protect its citizens against private acts of violence, but rather, places limitations on affirmative state action that denies life, liberty, or property without due process of law." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1065 (6th Cir. 1998).  However, the state has an affirmative duty to protect an individual against private acts of violence in two circumstances.  The first is where a "special relationship" exists between the state and the private individual, such as when the state takes a person into its custody.  *See DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 199-201 (1989).  The second, known as the state-created-danger theory, is where the state "cause[s] or greatly increase[s] the risk of harm to its citizens without due process of law through its own affirmative acts."  *Kallstrom*, 136 F.3d at 1066.  Section 1983 claims based upon the state-created-danger theory must meet three requirements:  (i) an affirmative act that creates or increases the risk that an individual will be exposed to private acts of violence, (ii) a special danger to the victim, as distinguished from the public at large, and (iii) the requisite degree of state culpability (specifically, that the state "must have known or clearly should have known that its actions specifically endangered an individual").  *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 464, 469 (6th Cir. 2006).

A.L. was not in a "special relationship" with the school district.[11] Thus, to survive dismissal

of her § 1983 claim, she must meet the three requirements of the state-created-danger theory.

### i.      Affirmative Act Requirement

With regard to the affirmative act requirement, the Sixth Circuit has only once before

expressly found the standard to have been met – in *Kallstrom*, where the city "releas[ed] private

information from [undercover] officers' personnel files to defense counsel representing violent gang

members whom the officers had investigated."[12] *McQueen*, 433 F.3d at 468.  That court has rejected

numerous other circumstances.  In *Bukowski v. City of Akron*, 326 F.3d 702, 709 (6th Cir. 2003), the

court concluded the police merely returned the plaintiff to a "preexisting danger" when they picked

up the mentally-disabled woman from a third party home, but returned her there after investigation,

and she was raped.  In *McQueen*, 433 F.3d at 464-67, the court found no affirmative act creating or

increasing the risk of private violence where, after the teacher left several students unsupervised,

a student with a history of behavioral problems fatally shot another student.  *See also Molina v. Bd.*

*of Educ.*, No. 07-10948, 2007 WL 4454928, at *6 (E.D. Mich. Dec. 14, 2007) (unreported),

(no affirmative act where school district officials returned bully who had threatened plaintiff to

plaintiff's classroom because plaintiff merely subjected to preexisting danger).

Although the affirmative act requirement is difficult to meet, this Court cannot definitively

conclude at this stage in the proceedings that it cannot be met.  The complaint alleges that

---

[11]*See McQueen*, 433 F.3d at 464 n.4 ("there is no special relationship between a school and its students that gives rise to a constitutional duty.") (quotation marks omitted).

[12]At least twice, the Sixth Circuit has assumed, without deciding, that the affirmative act requirement was met.  *See Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 493 (6th Cir. 2002); *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002).

Defendants committed an affirmative act that either created or increased the risk that A.L. would be exposed to third-party violence.  D.E. 1 at ¶ 74.  The complaint also alleges several times that Defendants unjustifiedly terminated A.L.'s adult escort.  At this point, discovery has not been completed.  Certain evidence, if it exists, could potentially establish an affirmative act.  For example, evidence showing that, but for the school district's providing an adult escort, A.L. would not have attended Huron High School, coupled with the school district's removal of the escort after A.L. began to attend school, could establish an affirmative act.  Such action on the part of Defendants could be distinguishable from the return-to-preexisting-danger cases.  In those cases, the officials merely returned the victim to precisely the same dangerous situation.  In this case, A.L. was not previously at Huron High School and thus was not returned by the school officials to a location of danger.  Rather the school may have created the danger because A.L. may not have agreed to attend Huron High School and be placed in a dangerous position (*i.e.*, in the same class as D.J.) without the school's prior assurance that it would provide the safety net of an adult escort.[13]

### ii.   Special Danger to the Victim

"A special danger exists where the state's actions place the victim specifically at risk, as distinguished from a risk that affects the public at large."  *McQueen*, 433 F.3d at 468 (internal quotation marks omitted).

The Court rejects Defendants' argument that A.L. fails to state a claim because A.L. was no

---

[13] The fact that A.L.'s mother (and perhaps A.L. herself) eventually consented to the removal of the escort may well be powerful evidence in favor of Defendants on this point. However, Defendants' actions in seeking and obtaining that consent could be understood by a fact finder to be affirmative acts themselves. *See* D.E. 1 at ¶ 24 (complaint allegation that Hein "pressured" A.L.'s mother to waive the escort).  In any case, Defendants have not argued that obtaining consent compels the conclusion that they committed no affirmative act.

more at risk from D.J.'s sexual advances than the public at large.  Courts have generally concluded where the action taken by a defendant is specific to the plaintiffs or the plaintiff and just a few others, this requirement is met.  *See Kallstrom*, 136 F.3d at 1067; *McQueen*, 433 F.3d at 468.  The action allegedly committed by Defendants – removing A.L.'s escort – impacted her exclusively.  Accordingly, A.L. has sufficiently alleged this element.

### iii.    State Culpability Requirement

To meet the state culpability requirement, a plaintiff "must demonstrate that the state acted with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment."  *McQueen*, 433 F.3d at 469 (citation omitted).  Further, "the government's conduct must be so egregious that it can be said to be arbitrary in the constitutional sense."  *Id.* (quotation marks and citation omitted).  In circumstances like this where Defendants had time for reflection in their judgments, the Sixth Circuit has characterized the requisite culpability as "deliberate indifference" (or alternatively, "subjective recklessness").  *Id.*; *see also Willis v. Charter Twp. of Emmett*, 360 F. App'x 596, 602 (6th Cir. 2010) (unpublished).  That is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *McQueen*, 433 F.3d at 469.  In practice, this standard requires the state to be aware of the nature of the serious harm to some degree of specificity.  *See id.* (state culpability requirement not met where teacher was aware of student's disruptive and violent behavior, but did have specific reason to know that the student would use a gun to kill another student if left unsupervised)

The complaint fails to state a claim in this regard.  It alleges only that Defendants "knew or should have known, based on the prior mediation and IEP processes, that its actions specifically

18

endangered the plaintiff." D.E. 1 at ¶ 76. Thus, the pleadings do not allege (nor is there any other indication that) Defendants were aware of the facts from which the inference could be drawn that a substantial risk of serious harm existed. Though A.L. alleges that Defendants knew that A.L.'s parents insisted on an adult escort, A.L. does not allege that Defendants knew the purpose of that escort was to thwart unwanted male attention. Moreover, A.L. does not allege that the school knew anything about D.J. or any potential danger that he posed to A.L. *Cf. Molina,* 2007 WL 4454928, at *1 (school officials were aware of the bully's threats toward the plaintiff). Accordingly A.L. has failed to allege that Defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists."

Because A.L.'s allegations do not meet the state-culpability requirement, this Court agrees with Defendants that A.L. fails to state a § 1983 claim. The § 1983 claim is dismissed.

### 2.      Qualified Immunity

The preceding analysis also serves to resolve Defendant Hein's claim that she is entitled to qualified immunity. As A.L. fails to state a claim of a constitutional violation, Hein is entitled to qualified immunity. *Willis*, 360 F. App'x at 603 (because plaintiff failed to establish a state-created-danger constitutional claim defendants entitled to qualified immunity); *Koulta v. Merciez*, 477 F.3d 442, 445-448 (6th Cir. 2007) (same).

### D.      Michigan PWDCRA Claim

Defendants argue that A.L.'s claims under the PWDCRA are precluded by the MMSEA. They argue that because A.L.'s claim is based upon a denial of educational opportunities of persons with disabilities, the "more specific directives" of the MMSEA control. A.L. responds that the cases cited by Defendants do not apply to her because the cases concern a failure to provide an educational

19

service or concern a disciplinary matter under the student's IEP, whereas her claims "arise from the act of violence against her." D.E. 17 at 16.

In *Woolcott v. State Bd. of Educ.*, 351 N.W.2d 601 (Mich. Ct. App. 1984) the Michigan Court of Appeals first referenced the principle Defendants argue here. In *Woolcott*, the plaintiff was a hearing-impaired public-school student. Although the plaintiff's parents requested that the school provide a speech interpreter, the chairman of the student's IEP committee rejected the request and the service was not provided. The plaintiff attended private school at her own expense and sued for damages and other relief under the MMSEA and what is now the PWDCRA. The *Woolcott* court distinguished between the two statutes, characterizing the predecessor statute to the PWDCRA as a "general act[] concerning basic civil rights for handicappers" and the MMSEA as a "specific rule for education [of] handicappers." *Id.* at 605. The court noted the principle that, "where there are two acts, one of which is special and particular and includes the matter in question, and the other of which is general, and which, if standing alone, would include the same matter and thus, conflict with the special act, the special act must be viewed as an exception to the general." *Id.* The court applied the principle to the MMSEA and the predecessor to the PWDCRA and concluded that the plaintiff was limited to the remedies provided by the MMSEA. *Id.*

In 2004, the Michigan Court of Appeals applied this principle to factual circumstances closer to this case. *See Miller ex rel. Miller v. Lord*, 686 N.W.2d 800 (Mich. Ct. App. 2004). In *Miller*, the plaintiff was injured by the sexual assault of a third party allegedly because of defendants' failures related to their obligations under the IEP. Miller was sent into the hallway for misbehaving, where another student met her, took her to the boys bathroom, and allegedly assaulted her. *Id.* at 801. Prior to that, in Miller's IEP proceedings, her mother had objected to the option of placing

20

Miller in the hallway for misbehavior and refused to sign the IEP.  Miller brought a claim under the

PWDCRA; she did not bring a MMSEA claim.  The court concluded that Miller's PWDCRA claim

was precluded, explaining:

> Here, plaintiffs' theory is that the school failed to accommodate by ignoring
> Tierra's mother's request, as well as Tierra's need, that she not be placed alone in the
> hallway.  As in both *Jenkins* and *Woolcott*, this particular issue was brought up,
> discussed, and resolved as part of Tierra's IEP. . . .
>
> *Because the challenged actions (or inactions) by defendants revolved around
> an issue dealt with in the IEP*, both the holdings and reasoning in *Jenkins* and
> *Woolcott* require that plaintiffs' claim under the PWDCRA be precluded by the
> MMSEA.  As in *Woolcott*, that is the appropriate result even though plaintiffs seek
> monetary damages unavailable under the MMSEA.

*Id*. at 804 (emphasis added).

A.L. does not provide any convincing reason to distinguish this case from *Miller*.  Although

A.L. argues that *Miller* involves an IEP matter, whereas her claim arises from the act of violence

against her, the *Miller* case, too, involved a sexual assault against the plaintiff.  The *Miller* court

focused on the specific behavior that defendants were alleged to have committed – the failure to

meet the obligations arguably established in the plaintiff's IEP procedures.  A.L. alleges that

Defendants committed the same type of conduct:  failing to provide the agreed-upon escort "in

violation of A.L.'s documented needs as well as the agreement among all parties to continue

providing such escort."  D.E. 1 at ¶¶ 51, 57.  The reference to "documented needs" and the

"agreement among all parties" can only logically be referring to the IEP process between A.L., her

parents, and the school district.  Accordingly, pursuant to Michigan law as established in *Woolcott*

and *Miller*, A.L.'s PWDCRA claims are precluded.

21

**III.     Conclusion**

For the reasons explained above, (i) A.L.'s claims are not dismissed for failure to exhaust administrative remedies, (ii) the complaint's § 1983 allegations fail to state a claim, (iii) Defendant Hein is entitled to qualified immunity, and (iv) A.L.'s PWDCRA claims are precluded. Accordingly,

Defendants' motion (D.E. 13) is GRANTED as to the § 1983 and PWDCRA claims, and those claims are DISMISSED. The motion is DENIED as to the ADA and Rehabilitation Act claims.

SO ORDERED.

Dated: January 11, 2011           s/Mark A. Goldsmith
       Flint, Michigan               MARK A. GOLDSMITH
                                  United States District Judge

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 11, 2011.

                                 s/Deborah J. Goltz
                                 DEBORAH J. GOLTZ
                                 Case Manager